Gary A. Gotto, State Bar No. 007401
Ron Kilgard, State Bar No. 005902
James A. Bloom, State Bar No. 026643
KELLER ROHRBACK, P.L.C.
3101 North Central Avenue, Suite 1400
Phoenix, Arizona  85022
602-248-0088
ggotto@krplc.com
rkilgard@krplc.com
jbloom@krplc.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| JAMES CORDELLO, trustee of the Mortgages Ltd. 401(k) Plan;<br><br>          Plaintiffs,<br><br>     vs.<br><br>MICHAEL DENNING; JANE DOE DENNING; GERALD K. SMITH, as Personal Representative of the ESTATE OF SCOTT M. COLES; CHRISTOPHER OLSON; and JANE DOE OLSON;<br><br>          Defendants. | NO. _____<br><br>**COMPLAINT**<br><br>**(Complaint for breach of ERISA fiduciary duty, breach of ERISA co-fiduciary duty, and prohibited transactions under ERISA)** |

## I.      PRELIMINARY STATEMENT

1.      This Complaint arises from the imprudent and self-interested management by Scott M. Coles, Michael Denning, and Christopher Olson (collectively "Defendants") of the Mortgages Ltd. 401(k) Plan (the "Plan" or the "401(k) Plan") in violation of their fiduciary duties of prudence, loyalty, and

diversificiation under the Employee Retirement Income Security Act of 1974, *codified at* 29 U.S.C. § 1001 et seq. ("ERISA"), and in violation of ERISA's prohibited transaction rules. Defendants, who were Trustees and fiduciaries of the Mortgages Ltd. Plan, failed to diversify the Plan's assets, and otherwise imprudently invested the Plan's assets in only a small number of mortgage loans located in and around Maricopa County, Arizona. On information and belief, Olson, Coles, and Denning also caused the Plan to recapitalize certain loans to provide liquidity to Mortgages Ltd. (the "Company") so that the Company could meet funding obligations on loans in which the Plan had no interest. Because of these and other breaches of fiduciary duty and prohibited transactions, the participants in the Plan have seen their retirement savings evaporate as the mortgages in the Plan have lost value.

2.     Scott Coles died on June 2, 2008. Defendant Gerald K. Smith has been named the personal representative of Scott Coles's estate by the Superior Court of Maricopa County, Arizona. These claims are asserted against Mr. Smith solely as the personal representative of Scott Coles pursuant to Ariz. Rev. Stat. § 14-3110.

## II.     JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

4.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Mortgages Ltd. Plan is and has been

administered in this District during all relevant times and because the fiduciary breaches described herein took place in this District.

### III.   THE PARTIES

#### a.  Plaintiffs

5.     James Cordello ("Plaintiff") is a named trustee of the Mortgages Ltd. 401(k) Plan and has served in that role since September of 2009.  Plaintiff worked at Mortgages Ltd. from 1993 until November of 2005, and served as a fiduciary of the 401(k) Plan from its inception until he left Mortgages Ltd. in 2005.  Plaintiff brings this action in his capacity as a fiduciary of the Mortgages Ltd. 401(k) Plan under ERISA § 502(a)(2) & (3) to restore the losses suffered by the Plan as the result of the conduct complained of herein, and for other appropriate equitable relief.

#### b.  Defendants

6.     Scott M. Coles was the Chief Executive Officer of Mortgages Ltd., was a trustee of the Mortgages Ltd. Plan, and was a fiduciary with respect to the Mortgages Ltd. Plan.  Coles was also a plan participant in the Mortgages Ltd. Plan at all relevant times.  Coles committed suicide on June 2, 2008.

7.     Defendant Gerald K. Smith has been named the personal representative of Scott Coles's estate by the Superior Court of Maricopa County, Arizona.  These claims are asserted against Mr. Smith in his capacity as the personal representative of Scott Coles pursuant to Ariz. Rev. Stat. § 14-3110.

8.     Michael Denning was Executive Vice President of Mortgages Ltd. from November 2005 until approximately March 2006, and was then President of Mortgages Ltd. until January 1, 2008.  During that time, he was a trustee of the Mortgages Ltd. Plan, and was a fiduciary with respect to the Mortgages Ltd. Plan. From January of 2008 through at least June of 2008, Denning served as a consultant for Mortgages Ltd.  Denning was a plan participant in the Mortgages Ltd. Plan at all relevant times and is currently a plan participant. On information and belief, all actions of Defendant Denning complained of herein were taken on behalf of and for the benefit of his marital community making the community liable for the results; Jane Doe Denning is named to bind the community.

9.     Defendant Christopher Olson was the Chief Financial Officer of Mortgages Ltd., was a trustee of the Mortgages Ltd. Plan, and was a fiduciary with respect to the Mortgages Ltd. Plan.  Olson was also a plan participant in the Mortgages Ltd. Plan at all relevant times and is currently a plan participant.  On information and belief, all actions of Defendant Olson complained of herein were taken on behalf of and for the benefit of his marital community making the community liable for the results; Jane Doe Olson is named to bind the community.

## IV.    THE PLAN

10.     The Plan is an ERISA qualified defined contribution pension plan established in 2001.

11.     The Plan reposed in the fiduciaries, rather than the participants, sole and exclusive authority to manage the investment of the Plan's assets.

4

12.     The Plan's governing documents allowed the fiduciaries to choose from a wide range of permissible investments.  Despite these permissible investments, the Plan's fiduciaries chose to invest the Plan's assets exclusively in a small number of mortgage loans, geographically concentrated in and around Phoenix, Arizona.

## V.     FACTS BEARING ON FIDUCIARY BREACHES

### a.  Mortgages Ltd.'s Business

13.     Mortgages Ltd. was a mortgage lender that was founded by Scott Coles' father in the 1960s.

14.     Mortgages Ltd.'s business was making mortgage loans.  Most of the borrowers used the loaned money to purchase or improve real property, or both. Virtually all of the loans were secured by property located in or around Phoenix, Arizona.  At the time of Coles's death in June of 2008, Mortgages Ltd. had a loan portfolio reportedly worth about $925 million.  *See* J. Craig Anderson, Investors in Charge of Revamped Valley Lender, *The Arizona Republic*, May 22, 2009.

15.     Mortgages Ltd. was a bridge lender, also known as a hard money lender.  As such, Mortgages Ltd. made short term loans with high interest rates to borrowers that needed immediate capital in order to start a project or move a project forward to a point where the borrower could bring in an equity partner or became qualified to obtain alternate, or "take-out" financing from another lender. Either the equity partner or the take-out financing would repay the loan from Mortgages Ltd.

16.     Denning gave sworn testimony to the Securities and Exchange Commission ("SEC") that "[o]ne of the conditions of a loan at Mortgages Limited was that there was a take-out scenario that the underwriters approved."  Olson's sworn testimony to the SEC confirmed that "[a] borrower would obtain take-out financing from another lender, so that money would be basically paid off…."

17.     If the loan matured without being paid off, which would happen if the expected take-out scenario did not materialize and no replacement take out financing could be obtained, the borrower would be in default on the loan.

18.     Mortgages Ltd. financed its mortgage lending business by selling fractional interests in the loans it made to investors.  Mortgages Ltd. thus had two main income streams – it retained fees each time it made a new loan, and kept a portion of the interest rate spread when it sold interests to investors.

19.     Mortgages Ltd. had a variety of obligations for which it needed liquidity.  Most of the interests in mortgage loans sold to investors by Mortgages Ltd. were for a limited period of time, and at the end of that period, Mortgages Ltd. was frequently obligated to redeem the investors' interests.  Additionally, several of the loans made by Mortgages Ltd. had delayed funding obligations, meaning that Mortgages Ltd. promised to loan additional money to the borrowers at some point in the future after the initial loan had been made.

20.     Mortgages Ltd. did not publicly market the mortgage loan investments – only accredited investors as defined in Rule 501(a) under the Securities Act of 1933 were allowed to invest in the loans.  Accredited investors

include high net-worth and high income individuals as well as various institutional investors.  Mortgages Ltd. also allowed a limited number of non-accredited investors to purchase interests in loans, so long as these investors "ha[d] such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment," pursuant to the safeharbor in SEC Rule 506.  Prior to being allowed to invest in the loans, however, all investors had to acknowledge in writing that the loans were "highly speculative and involve[d] substantial risk," including the risks of the real estate and credit markets.  Moreover, prospective investors had to acknowledge that they could afford to lose their entire investment in the loans.

21.    Prior to 2008, in marketing interests in these loans to investors and potential investors, Mortgages Ltd. emphasized that no investor had ever lost money investing in its loans. Mortgages Ltd. also emphasized that its loans had a history of strong performance, and that the loans rarely defaulted.  When loans did default, it was Mortgages Ltd.'s practice to use its best efforts to make sure that the investors in the loans did not lose their investment.  In some cases, Mortgages Ltd. would redeem these investors' interests.  In other cases, Mortgages Ltd. would offer to exchange the investors' interests in the defaulted loans for interests in other loans or interests in other loans programs.

22.    The sole shareholder of Mortgages Ltd. was the SMC Revocable Trust. Scott Coles was the SMC Revocable Trust's trustee and beneficial owner,

and the beneficiaries of the trust were Ashley Coles (Scott Coles's wife), and Scott Coles's children.

### b. The Downturn in the Real Estate and Credit Markets

23.    Like many other financial institutions, Mortgages Ltd. was dependent on functioning, liquid credit markets so that its borrowers could obtain take-out financing.  Similarly, if real estate values remained high, it would be easier for borrowers to find other lenders willing to make loans secured by real property and provide take-out financing.

24.    By 2006, however, the real estate market had begun to sour.  Based on this downturn in the real estate market, Mortgages Ltd. stopped making mortgage loans secured only by raw land in late 2006.

25.    During 2007, the credit markets got steadily worse, and it became more difficult for Mortgages Ltd.'s borrowers to obtain take-out financing—thus increasing the likelihood that these borrowers would default.

26.    Several of Mortgages Ltd.'s borrowers did default, and several more were forced to purchase maturity extensions from Mortgages Ltd.  Because Mortgages Ltd.'s practice was to ensure that its investors did not lose their investment if the loan they invested in default, these defaults placed an increasingly severe strain on Mortgages Ltd.'s liquidity.

### c.  Coles's Suicide and Mortgages Ltd.'s Bankruptcy

27.     On June 2, 2008, Coles committed suicide.

28.     Shortly after Scott Coles's death Mortgages Ltd. was forced into Chapter 7 bankruptcy, which was converted into a Chapter 11 proceeding. The bankruptcy proceedings are ongoing.

### d.  The Mortgages Ltd. 401(k) Plan

29.     On or about January 1, 2001, Mortgages Ltd. established the Mortgages Ltd. 401(k) Plan.  The Plan is an ERISA qualified defined contribution pension plan.

30.     The Plan reposed in its fiduciaries (Defendants here), rather than the participants, sole and exclusive authority to manage the investment of the Plan's assets.

31.     The Plan's governing documents allowed the fiduciaries to choose from a wide range of permissible investments. Despite these permissible investments, Defendants chose to invest the Plan's assets exclusively in a small number of mortgage loans, geographically concentrated in and around Phoenix, Arizona.

32.     As of the date of Scott Coles's death in June of 2008, the Plan had invested more than $22.4 million, over 98.2% of the Plan's assets, in just eight mortgage loans, each of which was secured by property in or around Phoenix, Arizona:

| Borrower/Loan Name | Amount Loaned by Plan | 12/31/2009 Appraised Value of Plan's Interest | % of Loan Owned By Plan | Date 401(k) Plan Made Loan | Location of Collateral (listed by county in AZ) |
|---|---|---|---|---|---|
| Vanderbilt | $7,048,356.56 | $1,627,632.00 | 64.08 | 7/11/07 | Maricopa |
| Hurst | $3,974,667.84 | $2,805,600.00 | 93.52 | 8/30/07 | Maricopa |
| CDIG | $3,139,308.71 | $590,000.00 | 100 | 10/16/07 | Pinal |
| Ecco | $2,521,100.00 | $400,000.00 | 100 | 6/28/07 | Pinal |
| GP Properties | $2,132,320.57 | $421,740.00 | 46.86 | 7/19/07 | Maricopa |
| 43rd & Olney | $1,400,000.00 | $490,000.00 | 87.5 | 12/1/06 | Maricopa |
| Downtown Community Builders | $1,250,000.00 | $900,000.00 | 100 | 7/26/07 | Maricopa |
| Bisonton | $959,924.10 | $479,925.00 | 63.99 | 9/8/06 | Navajo |
| Totals | $22,425,677.78 | $7,714,897.00 | | | |

### e. Defendant's Imprudent Conduct and Failure to Diversify the Plan's Assets

33.     Defendants' decisions to invest all of the 401(k) Plan's assets in just eight loans, all of which were high risk and secured by land in the same geographic area, was manifestly and recklessly imprudent and gave no heed whatsoever to diversification of the 401(k) Plan's assets.

34.     Defendants independently elected to invest the 401(k) Plan's assets in each of the eight Plan Loans, and then elected to invest additional amounts of the 401(k) Plan's money into these loans at least 60 times between March of 2007 and March of 2008 (41 of these additional investments occurred during 2007 while

Denning was a fiduciary for the Plan).  Each decision to invest in each of these eight loans and each decision to reinvest additional amounts into these loans constituted separate fiduciary acts—and each of these decisions was recklessly imprudent.

35.   The Plan paid for each and every one of these loans, and each additional investment into the loans, with cash on hand.  Thus the Defendants used a highly liquid, relatively safe asset (cash) and exchanged it for highly speculative, risky, illiquid, and unmarketable assets (the loans listed above).   After 2005, Defendants did not use the 401(k) Plan's cash to purchase any other types of investments, such as stocks, bonds, mutual funds, treasury notes, or any other type of asset typically considered appropriate for retirement savings.

36.   Defendants engaged in little or no investigation whatsoever into whether it would be prudent for the 401(k) Plan to invest in these assets, or whether it was prudent to hold all or just a portion of the Plan's assets in these loans.  Defendants did not consider or investigate making any other types of investments in the 401(k) Plan, nor did Defendants retain or consider retaining an independent investment fiduciary or investment advisor to help structure a prudent portfolio.  In fact, in September 2007, Defendants ignored advice from the Plan's attorney which advised Defendants "to revisit the issue of diversification in investments and to review whether an interest in mortgage loans continues to be a prudent investment for the Plan… a periodic review and analysis is an appropriate fiduciary task to consider and implement."   Instead, Defendants simply used

almost every available dollar the Plan had to make these loans or increase the Plan's exposure to them.

37.     Defendants' failure to consider diversifying the Plan's assets is particularly egregious in light of certain changes made to the Mortgages Ltd.'s Private Offering Memoranda (the "POM," which was the document through which Mortgages Ltd. marketed investments to accredited investors).  These changes were made to the POM while Denning was serving as President of Mortgages Ltd., and were made by counsel retained by Denning on behalf of Mortgages Ltd. to make the POMs more complete.  As amended, the POM instructed ERISA fiduciary investors who wished to invest their plan's assets in Mortgages Ltd. loans that they should consider "whether the investment satisfies the diversification requirements of Section 404(a) of ERISA" and "whether the investment is prudent, considering the nature of an investment in [the loans]."  The POM also indicated that "[t]he fiduciary should also consider the fact that there is not expected to be a market created in which to sell or otherwise dispose of the [loan interests]."  Despite these statements that Mortgages Ltd. made to potential investors in the loans, and which these potential investors had to acknowledge prior to investing with Mortgages Ltd., Defendants utterly failed to apply these same standards with respect to the 401(k) Plan here.

38.     Turning to the loans themselves, the loans were imprudent for several reasons, summarized here.

a.  Many of these loans (72% of the Plan's assets) were secured only by raw, undeveloped land, among the riskiest and most speculative types of real estate investment in the best of times.  Defendants' decision to invest in loans secured only by raw land is all the more inappropriate in light of the fact that, by late 2006, Mortgages Ltd. had generally stopped making new loans secured only by raw land based on the deteriorating real estate market in the Phoenix area.

b.  The borrowers on these loans had poor creditworthiness and questionable liquidity. For example, three of the loans (47% of the Plan's assets) were made to entities controlled by Michael Peloquin or Conley Wolfswinkel, people with long and checkered histories in Arizona land investment.  Defendants were aware of the credit risk posed by the borrowers on these loans.  Denning, for example, participated in a series of emails in March 2007 regarding a different loan Mortgages Ltd. made to the borrowers on the Hurst loan, describing how the borrowers had missed payments and failed to respond to communications regarding the delinquencies, and that Mortgages Ltd. had begun the process of having a trustee's sale of the property securing that loan.

c.  Many of the loans (72% of the Plan's assets) were intended to finance projects that were not yet entitled at the time the loans were made.

d.  Many of the properties (71% of the Plan's assets) were not appraised until after the Plan made the loan in question.

e.  Many of the loans (51% of the Plan's assets) rewrote earlier Mortgages Ltd. loans.   Olson's sworn testimony to the SEC confirmed that "[t]here were certainly some rewrites of loans, and loans that were rewritten over the years, and the 401(k) could have and did become an investor in some of those loans."

f.  Of particular concern, many of these rewritten loans were in danger of default at the time they were rewritten.   First, several of the rewritten loans (25% of the Plan's assets) had previously received short-term maturity extensions to help locate take-out or replacement financing at the time the Plan rewrote the loans.   Several more of the rewritten loans (20% of the Plan's assets) were just days away from default at the time the Plan rewrote the loans.   Defendants were aware that many of these loans had maturity extensions at the time they were rewritten.

g.  Many of the loans (69% of the Plan's assets) were not wholly owned by the Plan.   Thus the Plan had only an undivided interest in a portion of the collateral, and would become a co-tenant upon a foreclosure.

h.  Several of the loans (60% of the Plan's assets) were not fully funded when they were made, thus obligating the Plan to make future

14

extensions of credit or saddling the Plan with dependence on Mortgages Ltd. to fulfill these obligations.

39.     These loans were extraordinarily high risk investments, both individually and as a group, and especially so for a pension plan.  Not only did the interest rates on these loans reflect that high risk (the interest rates on the loans ranged from 12.25% to 14.5%, with a weighted average of 13.38%), but, as noted above, investors in these loans had to acknowledge in writing that the loans were "highly speculative and involve[d] substantial risk" prior to being allowed to invest in the loans.

40.     By June of 2008, the Plan had invested more than $22 million in just eight loans, the largest of which, Vanderbilt, amounted to 31.43% of the Plan's total assets.  This was a substantial concentration of risk, weighted towards a few, large loans, rather than spread out among numerous smaller loans (or better yet, numerous types of investments).  Denning testified to the SEC that a concentration of risk in a few large loans increased a portfolio's risk profile, noting, with respect to Mortgages Ltd.'s own portfolio, that another Mortgages Ltd. officer "shared my concern that large loans created too much concentration in the portfolio and, therefore, created additional risk."

41.     As noted above, Vanderbilt, the single largest loan in the Plan, constituted 31.43% of the Plan's assets, and was secured only by raw, undeveloped land—land for which the borrowers had not obtained the legal right to develop for their intended use.  The Plan initially invested in the Vanderbilt loan in July of

2007, long after Mortgages Ltd. had otherwise stopped making loans secured only by raw land.  Moreover, the Defendants continued to increase the Plan's holdings in the Vanderbilt loan throughout the end of 2007 and into 2008.

42.    Bisontown is a retreat center that is part of the Bison Ranch development in Heber-Overgaard, Arizona.  The Bisontown loan was originally a construction loan, but was rewritten after the construction was complete when it became clear that the borrower would be unable to find take-out financing.  But the Bisontown loan is not secured by the entire Bison Ranch development, or even the entire Bisontown retreat center.  Instead, the Bisontown loan's collateral was fragmented, and consisted of non-contiguous portions of the retreat center.

43.    These loans would have been imprudent in the best of times.  By late 2006, however, Mortgages Ltd. was aware that the real estate market was beginning to sour.  Numerous reports in national news media in 2006 indicated that Phoenix was the epicenter of a bursting real estate bubble.  By late 2007, the credit markets had also begun to contract.

44.    Throughout that time, however, the Defendants took no action to decrease the Plan's exposure to mortgage assets.  Instead, Defendants *increased* the Plan's holdings in such loans.  Even after September 1, 2007, the Defendants purchased over $9.5 million in new loan interests, representing over 42% of the Plan's current portfolio.  $1.2 million of these purchases (representing 5% of the Plan's portfolio) came during 2008—a time when it was abundantly clear the real estate market in Phoenix was in a tail spin.

16

f.     **Defendant's Self-Dealing and Disloyal Conduct**

45.    Defendants owed dual loyalties as officers and directors of Mortgages Ltd. and fiduciaries of the Plan.

46.    Because of this conflict of interest, the Defendants structured many of the transactions involving Plan assets in order to benefit Mortgages Ltd., not the Plan.

47.    As noted above in paragraphs 19 and 26, Mortgages Ltd. had numerous liquidity needs—it needed cash to original new loans, to redeem investors whose investment period ended and who did not want to reinvest, and it needed cash for delayed funding obligations on certain of its loans.  During 2007, the real estate and credit markets began to decline, restricting Mortgages Ltd.'s available liquidity.  As such, Defendants increasingly looked to the 401(k) Plan as a source of funds for Mortgages Ltd.; as the 401(k) Plan met Mortgages Ltd.'s liquidity needs, liquidity was freed up for Mortgages Ltd. to use elsewhere. Between April and September 2007, Defendants and other executives circulated and updated a spreadsheet (called "1A-Daily Cash Flow Projections.xls") that listed Mortgages Ltd.'s liquidity obligations and "Source[s] of Money" to pay those obligations.  The 401(k) Plan was listed as one such "Source of Money."  In August of 2007, Denning contacted Mortgages Ltd.'s loan originators (called "underwriters") to determine if they had a small loan in which the 401(k) Plan could loan $1.7 million.  In September of 2007, Denning emailed Scott Coles to suggest selling $3 million worth of the Vanderbilt loan from the 401(k) Plan to

free up "additional cash for new loans."  Additionally, Olson provided updates to Coles regarding the 401(k) Plan's "[c]ash remaining to invest" in September 2007. In November of 2007, Denning held a meeting with other Mortgages Ltd. executives at which, according to an attendee of the meeting, he instructed them to use all of the 401(k) Plan's cash to purchase interests in the loans.

48.    In order to provide liquidity to Mortgages Ltd., Defendants used the Plan's cash to purchase additional interests in many of the eight Plan loans between September 2007 and March of 2008.  The Plan purchased many of these interests in these loans from "mortgage pools" managed by Mortgages Ltd. so that Mortgages Ltd. could use the cash to originate new loans (and collect the fees that Mortgages Ltd. collected when it originated new loans) and satisfy funding obligations on existing loans.   As explained above in paragraph 19, most individual investors at Mortgages Ltd. invested only for a fixed period, and at the end of that period Mortgages Ltd. was contractually obligation to redeem these investors.  From and after December of 2007, Mortgages Ltd. relied on the 401(k) Plan to redeem individual investors so that Mortgages Ltd. did not have to use its cash to redeem their interests.  Each purchase of these loan interests by the Plan, whether from the mortgage pools or from individual investors, increased the Plan's expose to these loans and limited the ability of the 401(k) Plan to diversify its assets.  Moreover, these transactions were not entered into to benefit the Plan or its participants, but to relieve financial pressure on Mortgages Ltd.

49.     As explained above in paragraphs 15-17 & 23-26, Mortgages Ltd.'s loans were typically short term loans that would default at the end of the loan period if take-out financing did not pay off the borrower's debt.   Due to constrictions in the credit market that began during mid-2007, Mortgages Ltd.'s borrowers began having difficulty obtaining take-out financing for their obligations to Mortgages Ltd.   If a borrower defaulted, Mortgages Ltd. could allow the loan to default and collect the property, however, Mortgages Ltd.'s custom and practice was to redeem the investments of investors in loans that defaulted or transfer them to performing loans so that they did not lose their investment.   This security of investment was a major part of Mortgages Ltd.'s marketing of the loan interests.   Thus if the loan defaulted, Mortgages Ltd. would either be burdened with transferring or redeeming these investors or taking a hit to its marketing campaign.   As such, in order to prevent Mortgages Ltd.'s loans from defaulting, Defendants caused the Plan to rewrite many loans just days before maturity, or, in some cases, after special, short-term maturity extensions.   In this way, the Plan invested in loans that were already at risk of default (or already in default) in order to prevent Mortgages Ltd. from bearing the burden of a defaulting loan.

### g.  The GP Properties Transaction

50.     In addition to the GP Properties loan to an entity controlled by Michael Peloquin ("Peloquin"), Mortgages Ltd. had made numerous other loans to Peloquin controlled entities totaling millions of dollars.   By mid-2007, Peloquin's

entities were in danger of defaulting on many of those loans, which would have been burdensome for Mortgages Ltd.

51. In order to refinance the transactions, in July of 2007 Mortgages Ltd. caused the 401(k) Plan to rewrite the GP Properties loan, using $2 million of Plan assets. The GP Properties loan, which was ostensibly a construction loan designed to provide funds to develop the property, was secured by raw, undeveloped land. At the time the 401(k) Plan rewrote the loan, however, the borrower had not obtained final approval from the town of Carefree, Arizona to develop its desired project on the land. In fact, at the time of the loan, the borrower was in litigation with Carefree to force the municipality to allow the development (litigation which the borrower subsequently lost). Nevertheless, the 401(k) Plan rewrote the GP Properties loan, helping Mortgages Ltd. avoid the burdens of default, and helping make sure that the borrower's principal, Peloquin, could continue keeping all of his entities' loans from Mortgages Ltd. from defaulting. This provided a benefit to Mortgages Ltd. and Peloquin that was not shared by the 401(k) Plan.

52. As part of the rewrite of the GP Properties loan, the debt was increased from $2.7 million to $4.6 million, with no change in the value of the underlying property. This was radical change to the loan-to-value ratio, a change that substantially increased the riskiness of the loan, as a smaller change in the value of the collateral could leave the Plan under-collateralized. The Plan did not receive anything in exchange for such a drastic decrease in the security of the loan.

53.     However, despite its designation as a construction loan, not all of the money loaned on the GP Properties loan was given to Peloquin.  $489,000 of the money was used to pay back a private loan that Peloquin had obtained from SM Coles, LLC, an entity owned by Scott Coles, and the debt was simply added to the amount Peloquin owed on the GP Properties loan.  This transaction benefitted SM Coles, LLC (and to Coles, the sole owner of SM Coles, LLC) but provided no benefit to the Plan.  Each of the Defendants was aware of and approved of this transaction, and Denning in particular approved of this transaction in an email, agreeing that it "seem[ed] like an excellent idea, [to] reduce the debt while we have this window of opportunity."

54.     Additionally, $528,722.15 of the Plan's money was used to "refill" impound accounts on two other Peloquin loans, called the "La Place Loans" in which the Plan had no interest.  Impound accounts at Mortgages Ltd. were prepaid interest accounts—Mortgages Ltd. would withhold the total interest on the loans to the borrowers from the loans and create impound accounts, from which monthly interest payments were withdrawn by Mortgages Ltd.  By refilling these impound accounts, Mortgages Ltd. was able to prevent these other, non-Plan loans from going into default and preserved a stream of income for the investors in the La Place Loans, which benefitted Mortgages Ltd., Defendants (as officers and directors of Mortgages Ltd.), Coles (as the sole beneficial owner of Mortgages Ltd.), Peloquin, and the borrowers and investors in the La Place Loans, but provided no benefit whatsoever to the 401(k) Plan.

55.    The rewrite of the GP Properties loan, the payment of $489,000 to SM Coles, LLC, and the use of $528,722.15 to refill the impound accounts on the La Place Loans are referred to herein as the "GP Properties Transaction." Defendants caused the Plan to engage in the GP Properties Transaction in order to benefit Mortgages Ltd., Coles, SM Coles LLC, Peloquin, and the investors in the La Place Loans at the expense of the 401(k) Plan.

### h.  Other Prohibited Transactions

56.    Additionally, when the Plan made a loan, Mortgages Ltd. carefully structured the transactions so that it was the Plan itself making the loan, not Mortgages Ltd., and the Plan itself retained the origination fees and any other fees associated with the loan.  One type of fee was charged when investors in a loan needed a maturity extension.  In February of 2008, the borrowers on the CDIG loan paid a maturity extension fee totaling $31,393.  The 401(k) Plan was the lender, note holder, and beneficiary under the deed of trust for the CDIG loan, and no other investors invested in the CDIG loan.  But Coles and Olson carelessly deposited the extension fee into Mortgages Ltd.'s account, not the Plan's account. Neither Olson nor Coles took any action to transfer this money back to the Plan, and the Plan has not been able to recover any portion of $31,393 in the bankruptcy proceeding.  In addition, on information and belief, after Coles's death in December 2008, the borrowers on CDIG paid $47,089.63 to modify the payment schedule and interest rate on their loan.  This money was also deposited in Mortgages Ltd.'s general account and not paid to the 401(k) Plan.

57.     Chris Olson was not only a fiduciary for the plan, but owned 100% of the shares of a company called Fiduciary Investment Services, Inc. ("FIS"). FIS maintained an account with Mortgages Ltd. as an investor, and invested in CDIG prior to the Plan's October, 2007 rewrite of the CDIG loan, and in Downtown Community Builders prior to the Plan's rewrite of that loan. When the Plan rewrote CDIG, $13,525.85 of the Plan's money went to redeeming FIS's investment, and when the Plan rewrote Downtown Community Builders, $2,996.47 of the Plan's money went to redeeming FIS. Similarly, Olson maintained investments in the CDIG loan prior to the Plan's rewrite on behalf of his children. When the Plan rewrote the CDIG loan, $14,427.57 of the Plan's money went to redeeming the interests of Chris Olson's children from these loans.

### i.  Plaintiff's Knowledge of Defendants' Conduct

58.     The fiduciary investment practices Defendants engaged in differed significantly from those employed while Plaintiff worked at Mortgages Ltd. and while Plaintiff served as a fiduciary for the Plan. Plaintiff was unaware of Defendants imprudent, reckless, and self-dealing conduct or the damage it had caused the Plan until 2009 when he was appointed to a committee to help advise the management of the 401(k) Plan. In particular, prior to being appointed to the committee, Plaintiff was unaware of the identity or nature of the eight Plan loans, was unaware that Defendants conducted no or limited due diligence on any of the loans prior to their inclusion in the 401(k) Plan, and was unaware of Defendants' self-dealing and disloyal conduct involving 401(k) Plan assets. Finally, Plaintiff

did not learn that Defendants (including Denning) had authorized the GP Properties Transaction benefitting SM Coles, LLC, Mortgages Ltd., and the investors in the La Place Loans (whose impound accounts were refilled) until 2010 when he reviewed documents produced during discovery in *Furst v. Smith, et al.*, 09-2336 (D. Ariz.) (JWS).

## VI.   RELEVANT LAW

59.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a plan fiduciary for relief under ERISA § 409, 29 U.S.C. § 1109.

60.     ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part,

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

61.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes fiduciaries to seek equitable relief including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief to enjoin any act or practice which violates ERISA or the terms of a plan or seek relief to redress such violations or enforce any provisions of ERISA or the terms of the plan.

62. ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

63. These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.2 (2d Cir. 1982)). They entail, among other things:

(a) The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including in this instance the Property Account;

(b) The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

25

(c)     The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

64.     According to Department of Labor ("DOL") regulations and case law interpreting this statutory provision, in order to comply with the prudence requirement under ERISA §404(a), a fiduciary must show that: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

65.     According to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the

opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

   o   The composition of the portfolio with regard to diversification;

   o   The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

   o   The projected return of the portfolio relative to the funding objectives of the plan.

66.   ERISA § 404(a)(1)(C) also requires that fiduciaries maintain appropriate diversification of Plan assets.  Specifically, § 404(a)(1)(C) requires fiduciaries to "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."

67.   ERISA § 405 renders Plan fiduciaries liable for the breaches of other fiduciaries under certain circumstances, such as when a fiduciary knowingly participates in or conceals the breach of another fiduciary, if the fiduciary's own breach enables the breach by the other fiduciary, or if the fiduciary is aware of the other fiduciary's breach yet makes no reasonable effort to correct the breach.

68.   ERISA § 406 prohibits Plan fiduciaries from entering into transactions between the Plan and a party in interest or between the Plan and a fiduciary.

69.     ERISA § 206(d)(4) provides that courts may order an offset of all or part of a participant's benefits against the amount the participant is ordered or required to pay to the plan, if, among other things, the participant breached his ERISA fiduciary duties.

70.     As set forth herein and specifically in Count I of this Complaint, Defendants failed abysmally in their duty to manage the assets of the Plan prudently, loyally, and in the best interests of the Plan participants.

71.     As set forth herein and specifically in Count II of this Complaint, Defendants failed to fulfill their duties as cofiduciaries.

72.     As set forth herein and specifically in Count III of this Complaint, Defendants violated the prohibited transaction rules in § 406 of ERISA.

73.     As set forth herein and specifically in Count IV of this Complaint, Defendants violated their ERISA fiduciary duties and ERISA's prohibited transaction rules when they engaged in the GP Properties Transaction.

74.     Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties and co-fiduciary duties by Defendants, under the authority of ERISA § 502(a)(3) seeking equitable relief, and under § 206(d)(4) seeking an order offsetting Defendants' benefits to the extent they are otherwise unable to make good the Plan's loss.

## VII.   DEFENDANTS' FIDUCIARY STATUS

75.     ERISA treats as fiduciaries not only persons expressly named as fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i)-(iii), 29 U.S.C. § 1002(21)(A)(i)-(iii).

76.     Coles was a named trustee of the Plan from the inception of the Plan in 2001 until his death in June of 2008.  Olson was a named trustee of the Plan from July 1, 2006 until November 3, 2009.  Denning was a named trustee of the Plan from July 1, 2006 until January of 2008.

77.     The Plan defined the trustees' authority as "discretionary," meaning that Defendants, as trustees, had full and unilateral authority to decide the forms of investments and the date a security should be purchased or sold from the Plan.

78.     Defendants in fact exercised this authority to control the investment of the Plan's assets.  Olson and Denning exercised discretion and control over the Plan and its assets beginning in November of 2005 until they resigned as trustees.

Coles exercised such discretion from the formation of the 401(k) Plan until his death in June of 2008.

79.    Because defendants had and exercised discretionary control and authority over the management of the Plan and the Plan's assets, they were fiduciaries as to the Mortgages Ltd. 401(k) Plan under the meaning and intent of ERISA § 3(21)(A)(i) & (iii).  In addition, Defendants were named fiduciaries for the 401(k) Plan for all purposes pursuant to ERISA § 402(a)(1).

## VIII.  REMEDY FOR BREACH OF FIDUCIARY DUTY

80.    Defendants breached their fiduciary duties in that they knew, or should have known, the facts as alleged above, and therefore knew, or should have known, that the Plan was imprudently undiversified, and that Plan assets were being diverted for the benefit of the Company instead of the benefit of the Plan as described herein.  In addition, Defendants are liable for each other's breaches in that they knowingly participated in and concealed each other's breaches, they enabled each other's breaches through their own breaches, and were aware of each other's breaches yet made no reasonable effort to correct the breach.

81.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes plan fiduciaries to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary…who breaches any of the…duties imposed upon fiduciaries…to make good to such plan any losses to the plan…."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

82.     With respect to calculation of the losses to the Mortgages Ltd. Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have made or maintained its investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plan's assets prudently and appropriately.  In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.

83.     Plaintiffs are therefore entitled to relief from the Defendants in the form of: (a) a monetary payment to the Plan to make good to the Plan the losses resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); (c) injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3), to the extent applicable for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

84.     ERISA § 206(d)(4) provides that courts may order an offset of all or part of a participant's benefits against the amount the participant is ordered or

required to pay to the plan, if, among other things, the participant breached his ERISA fiduciary duties.

85.     Under ERISA, each Defendant is jointly and severally liable for the losses suffered in this case.

## IX.   CLAIMS

### Count I

### Breach of Fiduciary Duties of Prudence, Loyalty, and Diversification Under ERISA § 404 (Against All Defendants)

86.     Plaintiff reincorporates and realleges the preceding paragraphs as if fully set forth herein.

87.     As explained above in paragraphs 33-44, the eight loans that Defendants caused the 401(k) Plan to invest in were individually imprudent based on their size, the credit worthiness of the borrowers, the types and values of collateral, and the fact that many of the loans were on the brink of default at the time the Plan rewrote them.  Additionally, the Plan's investment in these loans as a group was highly imprudent and speculative.  As such, Defendants breached their fiduciary duties to prudently manage the Plan's assets.

88.     Investing 98.2% of the Plan's assets into these eight high-dollar, high-risk mortgage loans secured by Arizona property was a fundamental breach of the duty to diversify so as to minimize the risk of large losses.  Indeed, it is difficult to imagine a less diversified ERISA plan portfolio, or one more subject to the risk of large losses.

89.    Prior to making these loans, Plan had ready access to substantial amounts of cash—again, each time the Plan made one of these loans or repurchased additional portions of the loans from investors it did so from cash on hand—cash which could have been used to purchase less risky investments. However, Defendants repeatedly declined to use any of the cash to purchase less risky investments, despite the fact that the Plan's documents clearly permitted investment in other types of assets.  Defendants thus had the means, opportunity, and authority to diversify the 401(k) Plan's assets. In light of the catastrophic losses suffered by the Plan—the diminution in value alone amounts to more than $15 million—even modest diversification could have saved the Plan millions of dollars.

90.    Defendants conducted little or no due diligence whatsoever in electing to concentrate the Plan's $22 million in assets in just a few risky mortgage loans.  Defendants, as fiduciaries for the Plan, had an affirmative duty to educate themselves about the Plan's investments and consider reasonable alternatives.  The complete failure of due diligence, coupled with the uniquely speculative, risky, and undiversified portfolio was a breach of the duty of prudence in ERISA §404(a)(1)(B).

91.    In addition to Defendants' breaches of their duties of prudence and diversification, Defendants also breached their duty to loyally manage the Plan's assets in the interests of the Plan's beneficiaries and solely to provide retirement benefits.  As explained above in paragraphs 45-49, Defendants, each of whom was

a conflicted trustee based on their dual role as officer, director, or owner of Mortgages Ltd. on the one hand, and fiduciary for the 401(k) Plan on the other hand, made numerous investment decisions for the 401(k) Plan in order to benefit Mortgages Ltd.   Defendants engaged in disloyal conduct by: (1) using the Plan's assets to satisfy Mortgages Ltd.'s liquidity needs (¶ 47), (2) using the Plan's assets to purchase interests in loans from mortgages pools managed by Mortgages Ltd. so that Mortgages Ltd. could access the money (¶ 48), (3) using the Plan's assets to rewrite loans that would have otherwise defaulted (¶ 49). Using the 401(k) Plan's assets in these ways helped alleviate Mortgages Ltd.'s liquidity concerns, allowed Mortgages Ltd. and its investors avoid the financial burden of default, and protected Mortgages Ltd.'s reputation as a safe investment partner.   Despite these benefits for Mortgages Ltd. and its other investors, using the Plan's assets in this way radically increased the Plan's exposure to loans that were *even riskier* that ordinary high-interest rate, hard money mortgage loans for no other reason that the fact that the borrowers had already been in danger of defaulting.   As such, Defendants did not manage the 401(k) Plan in the interests of plan participants and solely to provide retirement benefits, but instead managed the Plan's assets to benefit Mortgages Ltd. and its investors.

92.   As such, Defendants breached their fiduciary duty of loyalty by failing to manage the 401(k) Plan's investments solely in the interests of the Plan and its participants and beneficiaries; breached their fiduciary duty of prudence to manage the assets of the 401(k) Plan as a reasonably prudent fiduciary would have

done; and breached their fiduciary duty to diversify the 401(k) Plan's assets by maintaining and increasing the Plan's investment in highly risky assets of a single type exposed to concentrated geographic market risk.  ERISA § 404(a)(1)(A)-(C); 29 U.S.C. § 1104(a)(1)(A)-(C).

93.    Defendants' imprudent and disloyal investment management and failure to diversify caused devastating losses to the 401(k) Plan.  As the borrowers on these loans defaulted, the 401(k) Plan was left only with the property securing the loans, which has lost most of its value as the real estate market nationwide, and particularly in and around Phoenix, Arizona, have plunged.  As of December 31, 2009 (the last appraisal of the Plan's assets), the Plan's assets had declined in value from $22.4 million (the amount of cash the Plan invested had invested in loans by June of 2008) to $7.7 million—a 65.6% decline.  Had Defendants invested the 401(k) Plan's cash in a more diversified portfolio that a reasonably prudent fiduciary would have invested in, as opposed to the highly risky, concentrated portfolio construct by conflicted trustees in order to benefit Mortgages Ltd., the Plan would have avoided these losses and realized a reasonable investment return on its capital.

## Count II

### Co-Fiduciary Liability
### Under ERISA § 405
### (Against All Defendants)

94.    Plaintiff reincorporates and realleges the preceding paragraphs as if fully set forth herein.

95.    Each Defendant's failure to comply prudently and loyally manage the assets of the 401(k) Plan enabled each other Defendant to breach their fiduciary duties to the 401(k) Plan and engage in prohibited transactions involving the 401(k) Plan's assets.  In particular, the Defendants' failure to conduct any due diligence regarding the propriety of a highly risky and undiversified portfolio enabled the other Defendants to maintain and increase the 401(k) Plan's exposure to such a highly risky, undiversified portfolio. In addition, Defendants placed the interests of Mortgages Ltd. and its investors ahead of the interests of the 401(k) Plan by rewriting or investing in loans to relieve Mortgages Ltd. of the burden of loans that were in default and/or to provide liquidity to Mortgages Ltd.—this conduct allowed the other Defendants' to breach their fiduciary duties by maintaining and increasing the 401(k) Plan's exposure to the highly risky, undiversified portfolio.

96.    Each Defendant was aware that each other Defendant was imprudently and disloyally increasing the 401(k) Plan's exposure to a highly risky and undiversified pool of assets, but made no effort to remedy this conduct or protect the 401(k) Plan's interests.

97.    As such, in addition to their own liability for their imprudent and self-interested conduct, Defendants are each liable for each other's fiduciary breaches under ERISA § 405(a)(1)-(3); 29 U.S.C. § 1105(a)(1)-(3).

98.    Defendants' imprudent and disloyal conduct has caused devastating losses to the 401(k) Plan.  Had Defendants fulfilled their duties as co-fiduciaries

(as described in ERISA § 405(a)(1)-(3)), the Plan would have avoided these losses and realized a reasonable investment return on its capital.

## Count III

### Prohibited Transactions
### Under ERISA § 406
### (Against All Defendants)

99.     Plaintiff reincorporates and realleges the preceding paragraphs as if fully set forth herein.

100.     Defendants, as fiduciaries of the Plan, were parties in interest to the Plan.  ERISA § 3(14)(A).  Mortgages Ltd., as an employer whose employees were covered by the 401(k) Plan, was a party in interest under ERISA § 3(14)(C).  Olson's company FIS was a parties in interest under ERISA § 3(14)(G), and Olson and his family were parties in interest under  ERISA § 3(14)(A), (F).

101.     ERISA prohibits "transfer[s] to, or use by or for the benefit of a party in interest, of any asset of [a] plan."  ERISA § 406(a)(1)(D).  ERISA also prohibits fiduciaries from dealing with plan assets in their own interest, ERISA § 406(b)(1), as well as from engaging in transactions involving the plan while acting on behalf of a party whose interests are adverse to the plan, ERISA § 406(b)(2).

102.     Defendants engaged in four different types of prohibited transactions involving the 401(k) Plan: (1) 401(k) Plan rewrote Mortgages Ltd. loans which were on the brink of default or which had received maturity extensions, (2) the 401(k) Plan bought out investors to satisfy Mortgages Ltd.'s liquidity needs, (3)

Olson and Coles allowed loan extension fees that belonged to the Plan to be deposited into Mortgages Ltd.'s general account, and (4) certain of the Plan loans repaid the investment of Olson's family members.

103.   As noted above at paragraph 38(e)-(f), 51% of the 401(k) Plan's loans rewrote other Mortgages Ltd. loans, many of which had received maturity extensions and many more of which were within days of default at the time of the Plan's rewrite.  Using Plan assets to prevent default on these loans provided a substantial benefit to Mortgages Ltd., which would otherwise have had to admit to investors that the loan had defaulted.  Moreover, it was Mortgages Ltd.'s custom and practice to ensure that investors in loans that defaulted did not lose their investment, whether by transferring them to other loans or by redeeming their investment.  Using the Plan's assets to prevent default thus saved Mortgages Ltd. the obligation of either providing for these investors or seriously damaging its business relationships with these investors.  By using the Plan's assets to rewrite these loans to prevent them from defaulting, Defendants used Plan assets for the benefit of Mortgages Ltd.  Since Defendants and Mortgages Ltd. were parties in interest, these rewrite transactions violated ERISA § 406(a)(1)(D), and because the transactions benefitted Defendants and Mortgages Ltd. at the expense of the Plan, they were prohibited transactions under ERISA § 406(b).

104.   As explained above in paragraph 49, Defendants also caused the 401(k) Plan to purchase the investments of investors at Mortgages Ltd. that Mortgages Ltd. otherwise would have been obligated to redeem.  Using the Plan's

assets to redeem these investors saved Mortgages Ltd. the burden of redeeming them—thereby using Plan assets for the benefit of Mortgages Ltd.   Since Defendants and Mortgages Ltd. were parties in interest, these redemptions violated ERISA § 406(a)(1)(D), and because the transactions benefitted Defendants and Mortgages Ltd. at the expense of the Plan, they constituted prohibited transactions under ERISA § 406(b).

105.   As noted above in paragraph 56, in February of 2008, Olson and Coles agreed to extend the term of the CDIG loan.   In December of 2008, Olson agreed to modify the terms of the CDIG loan again.   CDIG paid $31,393 for the term extension and $47,089.63 for the rewrite.   There were not investors in the CDIG loan with the 401(k) Plan—the 401(k) Plan was the sole lender on the loan. Nevertheless, these payments were both deposited into the Mortgages Ltd. general account, not the account of the 401(k) Plan.   The failure to pay the CDIG fees— which were Plan assets—to the 401(k) Plan amounted to a violation of ERISA § 406(a)(1)(D) as a "transfer to, or use by or for the benefit of a party in interest [Mortgages Ltd.], of any asset of [a] plan."   These transactions were prohibited under ERISA § 406(a)(1)(A) & (D).

106.   Chris Olson also owned a company called Fiduciary Investment Services, Inc. ("FIS").   FIS maintained an account with Mortgages Ltd. as an investor, and invested in CDIG prior to the Plan's October, 2007 rewrite of the that loan, and in Downtown Community Builders prior to the Plan's rewrite of that loan.   When the Plan rewrote CDIG, $13,525.85 of the Plan's money went to

redeeming FIS's investment, and when the Plan rewrote Downtown Community Builders, $2,996.47 of the Plan's money went to redeeming FIS.  Similarly, Olson maintained investments in the CDIG loan prior to the Plan's rewrite on behalf of his children.  When the Plan rewrote the CDIG loan, $14,427.57 of the Plan's money went to redeeming the interests of Chris Olson's children from these loans.  These transactions were prohibited under ERISA § 406(a)(1)(A) & (D).

107.    Had Defendants not engaged in these prohibited transactions, and instead prudently and loyally invested the Plan's assets, the Plan would have avoided these losses and realized a reasonable investment return on its capital.

### Count IV

### Breach of Fiduciary Duties of Prudence and Loyalty and Prohibited Transactions
### Regarding the GP Properties Transaction
### Under ERISA §§ 404 & 406
### (Against All Defendants)

108.    Plaintiff reincorporates and realleges the preceding paragraphs as if fully set forth herein.

109.    As explained in paragraphs 50-55, when the 401(k) Plan rewrote the GP Properties loan in July of 2007, lending $2,000,000.00 of Plan assets, some $489,000 was paid to SM Coles, LLC out of the loan proceeds and another $528,722.15 was used to populate the impound accounts (accounts used to fund taxes, insurance or prepaid interest) of other loans not owned by the Plan, for the benefit of Mortgages Ltd. and its investors.  The rewrite, the payment to SM

Coles, LLC, and using the assets to refill the impound accounts on the La Place Loans are collectively referred to as the "GP Properties Transaction."

110. The GP Properties loan that was rewritten had been a $2.7 million loan prior to the rewrite, the loan as rewritten by the 401(k) Plan was for $4.6 million—with no change to the underlying collateral for the loan. This was radical change to the loan-to-value ratio, a change that substantially increased the riskiness of the loan from the Plan's perspective as lender. The Plan did not receive anything in exchange for such a drastic decrease in its security.

111. Defendants' decision to engage in the GP Properties Transaction violated the fiduciary duties of prudence and loyalty contained in ERISA §404 and the prohibited transaction rules contained in ERISA § 406(a) and (b).

112. Putting aside the obvious self dealing involved with the GP Properties Transaction, no reasonably prudent fiduciary would have allowed the Plan to engage in the GP Properties Transaction when (1) the loan-to-value ratio dropped significantly; (2) the Plan's assets were used to refill the impound accounts of non Plan Loans; and (3) the Plan's assets were used to pay SM Coles, LLC money owed to SM Coles, LLC by the borrower on the GP Properties loan— all with no benefit accruing to the 401(k) Plan. Because no reasonably prudent fiduciary would have entered into the GP Properties Transaction, it violated ERISA's fiduciary duty of prudence. ERISA § 404(a)(1)(B).

113. The GP Properties Transaction was designed to benefit (1) SM Coles, LLC, which received cash in full payment of the loan Michael Peloquin

owed to it; (2) the investors in the La Place Loan, whose impound accounts were refilled, staving off default and ensuring that they continued to collect interest on the loan, (3) Michael Peloquin, whose loans did not default, and (4) Mortgages Ltd., which did not have to report the default of the loans it had made to Peloquin or potentially reimburse the investors in those loans, while providing no value to the Plan whatsoever.  As such, the GP Properties Transaction violated ERISA's duty of loyalty. ERISA § 404(a)(1)(A).

114.   SM Coles, LLC was wholly owned by Scott Coles, a fiduciary for the 401(k) Plan.  As such, SM Coles, LLC was a party in interest with respect to the 401(k) Plan under ERISA § 3(14)(G).  Mortgages Ltd. was an employer whose employees were covered by the Plan, rendering it a party in interest under ERISA §3(14)(C).

115.   ERISA prohibits "transfer[s] to, or use by or for the benefit of a party in interest, of any asset of [a] plan."  ERISA § 406(a)(1)(D).  Because SM Coles, LLC was a party in interest, it was a prohibited transaction for the Plan to transfer Plan assets (cash) to SM Coles, LLC.

116.   ERISA also prohibits fiduciaries from dealing with plan assets in their own interest, ERISA § 406(b)(1), as well as from engaging in transactions involving the plan while acting on behalf of a party whose interests are adverse to the plan, ERISA § 406(b)(2).  By causing the Plan to engage in the GP Properties Transaction, each Defendant dealt in their own interest with Plan asset—since each Defendant was a director or officer of Mortgages Ltd., the use of Plan assets

to stave off default in the Peloquin loan portfolio (and refill the impound accounts on the La Place Loans) provided Defendants a benefit at the expense of the Plan. Coles received an additional benefit at the expense of the 401(k) Plan by using Plan assets to repay an obligation owed to SM Coles, LLC by Michael Peloquin— shifting the risk of nonpayment to the Plan.  Similarly, each Defendant acted on behalf of Mortgages Ltd. and its investors (as did Coles on behalf of SM Coles, LLC) in the GP Properties Transaction—the interest of Mortgages Ltd. and its investors in using 401(k) Plan assets to stave off default in the La Place Loans was adverse to the 401(k) Plan's interest.  As such, the GP Properties Transaction was prohibited by ERISA § 406(b)(1) and (2).

117.   In addition to the $1,017,722.15 of Plan assets that were diverted to SM Coles, LLC and the investors in the La Place Loans, the value of the Plan's share of the GP Properties loan fell from $2,132,320.57 (which is how much cash the 401(k) Plan invested in the loan) in June of 2008 to an appraised value of $421,740.00 as of December 31, 2007—a decline of $1,710,580.57.   Had Defendants prudently and loyally invested the Plan's money instead of engaging in the GP Properties Transaction, the Plan would have avoided these losses and realized a reasonable investment return on its capital.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.      A Declaration that Coles, Olson, and Denning breached their ERISA fiduciary duties to the Plan;

B.      An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, co-fiduciary duty, and violations of ERISA's prohibited transaction rules, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have if the Defendants had fulfilled their fiduciary obligations;

C.      An Order offsetting all or part of the benefits that Defendants would otherwise be entitled to receive under the Plan against the amount of loss their fiduciary breaches caused the Plan that they are otherwise unable to pay, pursuant to ERISA § 206(d)(4);

D.      Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g) and other applicable law;

F.      An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law;

G.      An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants; and

H.    Granting such other and further relief as the Court may deem just and proper.

DATED this 22nd day of August, 2011.

KELLER ROHRBACK, P.L.C.

By:  /s/ James A. Bloom
     Gary A. Gotto
     Ron Kilgard
     James A. Bloom
     3101 North Central Avenue, Suite 1400
     Phoenix, Arizona 85012
     Attorneys for Plaintiff